Robert E. Johnston (admitted *pro hac vice*)
rjohnston@hollingsworthllp.com
Andrew L. Reissaus (admitted *pro hac vice*)
areissaus@hollingsworthllp.com
Hollingsworth LLP
1350 I Street, NW
Washington, DC  20005
Telephone:  (202) 898-5800
Facsimile:  (202) 682-1639

James A. Bruen (State Bar No. 43880)
jbruen@fbm.com
Sandra A. Edwards (State Bar No. 154578)
sedwards@fbm.com
Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
Telephone:  (415) 954-4400
Facsimile:  (415) 954-4480

*Attorneys for Defendant Novartis
Pharmaceuticals Corporation*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Kristi Lauris, Individually and as Successor in Interest to the Estate of Dainis Lauris; Kristi Lauris as Guardian ad Litem for L.L.; and Taylor Lauris, <br><br> Plaintiffs, <br><br> vs. <br><br> Novartis AG, a Global Healthcare Company; Novartis Pharmaceuticals Corporation, a Delaware Corporation, <br><br> Defendants. | Case No.  1:16-cv-00393-SEH <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF NOVARTIS PHARMACEUTICALS CORPORATION'S MOTION FOR SUMMARY JUDGMENT** <br><br> Hon. Sam E. Haddon <br><br> Trial Date:   January 23, 2018 |

**Table of Contents**

INTRODUCTION ........................................................................................................................ 1

STATEMENT OF FACTS ........................................................................................................... 2

   I.   Mr. Lauris' Medical History and Risk Factors for Atherosclerosis ................................ 2

      a.   CML and TKIs ......................................................................................................... 2

      b.   Mr. Lauris' CML became resistant to multiple treatments before Tasigna®. ............ 2

      c.   For years before he received Tasigna®, Mr. Lauris had a long history of multiple risk factors for cardiovascular disease, the number one cause of death in the United States. ...................................................................................................................... 3

   II.   Dr. Hoffmann's Decision to Prescribe Tasigna ............................................................. 5

      a.   Tasigna® was a second-line TKI therapy for Mr. Lauris. .......................................... 5

      b.   The warnings available to Dr. Hoffmann while prescribing Tasigna® ...................... 6

         i.   The Tasigna® prescribing information ................................................................ 6

      c.   Dr. Hoffmann did not testify that he would have changed his prescribing decision based on the FDA-approved warning in January 2014. ............................................. 9

   III.  Mr. Lauris Died on March 31, 2014, As a Result of a Bleeding Complication of a Vascular Procedure Performed by Dr. Randall Stern. ...................................................... 10

   IV.  By November 2013, Mr. Lauris Knew That He Had Atherosclerosis, Which He Believed to Be Accelerated and Diffuse and Caused By Tasigna®. ................................................ 11

SUMMARY JUDGMENT STANDARD ................................................................................... 12

ARGUMENT .............................................................................................................................. 12

   I.   Plaintiffs' Survivor Claims (and Related Punitive Damages Relief) Are Barred by the Statute of Limitations. ................................................................................................... 12

   II.   Plaintiffs' Failure To Warn Claims – And Thus All Of Their Claims – Cannot Survive Summary Judgment Because NPC Provided an Adequate Warning and Because Plaintiffs Cannot Show That A Different Warning Would have Prevented Mr. Lauris' Alleged Injury. ............................................................................................................................. 15

      a.   NPC's warning was adequate as a matter of law. ................................................... 16

      b.   Dr. Hoffmann would have prescribed Tasigna® anyway.......................................... 20

   III.  Plaintiffs Have No Admissible Evidence of Causation. ................................................. 24

1

CONCLUSION ................................................................................................................. 25

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- ii -

1

## Table of Authorities

2

## FEDERAL COURT CASES

3

4

*Ackermann v. Wyeth Pharm.,*
    526 F.3d 203 (5th Cir. 2008).............................................................................23

5

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) .........................................................................................12

6

7

*Carroll v. Bristol Park Med. Grp., Inc.,*
    No. G046113, 2012 WL 5328740 (Cal. Ct. App. Oct. 29, 2012) .......................13

8

*Casey v. Ohio Med. Prods.,*
    877 F. Supp. 1380 (N.D. Cal. 1995) .................................................................24

9

10

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) .........................................................................................12

11

*Ebel v. Eli Lilly & Co.,*
    321 Fed. App'x 350 (5th Cir. 2009)...................................................................22

12

13

*Eberhart v. Novartis Pharm. Corp.,*
    867 F. Supp. 2d 1241 (N.D. Ga. 2011) .............................................................20

14

*Erickson v. Boston Sci. Corp.,*
    846 F. Supp. 2d 1085 (C.D. Cal. 2011)..............................................................13

15

16

*Estate of McNeil v. Freestylemx.com, Inc.,*
    177 F. Supp. 3d 1260 (S.D. Cal. 2016)..............................................................15

17

*Georges v. Novartis Pharm. Corp.,*
    988 F. Supp. 2d 1152 (C.D. Cal. 2013)..............................................................20

18

19

*Hendrix v. Novartis Pharm. Corp.,*
    647 Fed. App'x. 749 (9th Cir. 2016)..................................................................13

20

*In re Silicone Gel Breast Implants Prods. Liab. Litig.,*
    318 F. Supp. 2d 879 (C.D. Cal. 2004)................................................................24

21

22

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986) .........................................................................................12

23

*Morales v. Am. Honda Motor Co., Inc.,*
    151 F.3d 500 (6th Cir. 1998).............................................................................23

24

25

*Motus v. Pfizer Inc.,*
    196 F. Supp. 2d 984 (C.D. Cal. 2001)........................................................*passim*

26

*Nix v. SmithKline Beecham Corp.*
    No. CV-06-43-PHX-SMM, 2007 WL 2526402 (D. Ariz. Sept. 5, 2007).......................21, 23

27

*Odom v. G.D. Searle & Co.,*
    979 F.2d 1001 (4th Cir. 1992)...........................................................................23

28

- iii -

*Rosa v. Tazer Int'l, Inc.,*
    684 F.3d 941 (9th Cir. 2012) ............................................................................ 16

*Soliman v. Philip Morris Inc.,*
    311 F.3d 966 (9th Cir. 2002) ...................................................................... 12, 13

*Vanderwerf v. SmithKlineBeecham Corp.,*
    529 F. Supp. 2d 1294 (D. Kan. 2008) ............................................................... 23

**STATE COURT CASES**

*Brown v. Superior Court,*
    44 Cal. 3d 1049 (1988) .............................................................................. 16, 18

*Buckner v. Milwaukee Electric Tool Corp.,*
    222 Cal. App. 4th 522 (2013) ........................................................................... 18

*Carlin v. Superior Court,*
    13 Cal. 4th 1104 (1996) .................................................................................... 17

*Finn v. G. D. Searle & Co.*
    35 Ca1. 3d 691 (1984) ............................................................................... 16, 17

*Fox v. Ethicon Endo-Surgery, Inc.,*
    35 Cal. 4th 797 (2005) ................................................................................ 12, 13

*Huitt v. Southern California Gas Co.,*
    188 Cal. App. 4th 1586 (2010) ......................................................................... 20

*Jones v. Ortho Pharm. Corp.,*
    163 Cal. App. 3d 396 (1985) ................................................................. 21, 23, 24

*M & F Fishing, Inc. v. Sea-Pac Ins. Managers, Inc.,*
    202 Cal. App. 4th 1509 (2012) ......................................................................... 13

*Norgart v. Upjohn Co.,*
    21 Cal. 4th 383 (1999) ...................................................................................... 13

*Pooshs v. Philip Morris USA, Inc.,*
    51 Cal. 4th 788 (2011) ...................................................................................... 14

*Temple v. Velcro USA, Inc.,*
    148 Cal. App. 3d 1090 (1983) ........................................................................... 16

**STATE STATUTORY AUTHORITIES**

Cal. Civ. Proc. Code § 335.1 ................................................................... 12, 15

**FEDERAL RULES AND REGULATIONS**

21 CFR 314.510 ..................................................................................................... 5

Fed. R. Civ. P. 56(a) ........................................................................................... 12

1

## ADDITIONAL AUTHORITIES

2

*Judicial Council of California Civil Jury Instructions*
    (2016 edition) at CACI Nos. 1222 and 1205 ........................................................................18

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**INTRODUCTION**

2       Novartis Pharmaceuticals Corporation ("NPC") submits this memorandum in support of

3   its motion for summary judgment on all survival action and wrongful death claims of Kristi

4   Lauris and her children ("plaintiffs").  Plaintiffs allege that Dainis Lauris' use of NPC's product

5   Tasigna® – a medication administered to him after prior chronic myeloid leukemia ("CML")

6   therapies failed – caused him to develop atherosclerosis in his legs and to suffer a fatal

7   atherosclerotic event (a stroke).  All of plaintiffs' claims, whether framed as strict liability or

8   negligence, rest on the same core allegation that NPC failed to adequately warn Mr. Lauris'

9   oncologist regarding the known or knowable potential risk of atherosclerotic-related events prior

10  to October 2012, when Mr. Lauris' oncologist first prescribed Tasigna®.  Second Am. Compl.

11  (ECF No. 87) ¶¶ 1, 47, 51.

12      NPC moves for summary judgment on multiple grounds.  First, plaintiffs' survivor claims

13  fail as a matter of law because Mr. Lauris was aware that he had atherosclerosis by no later than

14  November 2013, but plaintiffs failed to file their suit within the applicable two-year statute of

15  limitations.  Second, plaintiffs' claims fail in their entirety because Tasigna®'s FDA-approved

16  warnings were adequate as a matter of law when Dr. Hoffmann prescribed Mr. Lauris Tasigna®.

17  NPC and FDA updated Tasigna®'s labeling each year as a part of its accelerated approval by

18  FDA, and NPC regularly submitted updated safety information to FDA.  SUF 51, 52.  The

19  labeling in effect when Dr. Hoffmann prescribed Tasigna® adequately disclosed the fact that

20  atherosclerosis had occurred in patients treated with Tasigna®.  Third, plaintiffs' claims fail

21  because they cannot meet their burden to show that a different warning would have avoided Mr.

22  Lauris' alleged injuries – that is, that Dr. Hoffmann would not have prescribed Tasigna® had a

23  different warning been provided.  Finally, plaintiffs' claims fail as a matter of law because

24  plaintiffs have not offered reliable evidence of both general and specific causation – i.e., that

25  Tasigna® can cause atherosclerosis (and more specifically, the intracranial atherosclerosis that

26  allegedly resulted in Mr. Lauris' death), and that Tasigna® did in fact cause Mr. Lauris'

27  intracranial atherosclerosis and his death.

28

**STATEMENT OF FACTS**

**I.   MR. LAURIS' MEDICAL HISTORY AND RISK FACTORS FOR ATHEROSCLEROSIS**

    **a.   CML and TKIs**

Chronic myeloid leukemia (CML) is a cancer of the blood and bone marrow that causes uncontrolled proliferation of white blood cells.  SUF 1.  Patients diagnosed with CML can develop an enlarged liver and spleen and have anemia, shortness of breath and abdominal pain.  SUF 2.  CML accounts for about 15 percent of all adult leukemias.  SUF 2.  CML is diagnosed most frequently in the sixth and seventh decade of life.  *Id.*  In 2017, in the United States there were an estimated 8,950 new cases of CML diagnosed and an estimated 1,080 patients died from CML. SUF 3.  There are three progressive stages of CML, an initial chronic phase, which is followed by an accelerated phase and a terminal blastic phase.  SUF 4.  Approximately one-third of patients progress directly from the first (chronic) phase to the final, terminal (blastic) phase.  SUF 5.  Median survival after diagnosis of the blastic phase currently ranges between 7 and 11 months. SUF 6.

In 2001, the U.S. FDA approved the first tyrosine kinase inhibitor (TKI), NPC's Gleevec® (imatinib) for the treatment of CML in patients in chronic phase.  SUF 7.  Gleevec® resulted in significant improvement in patient survival, compared to previous treatments.  SUF 8, 12.  Before TKIs, fewer than half of patients diagnosed with chronic phase CML survived for 5 years.  *Id.*  After the introduction of Gleevec®, survival rates improved to 60.1% of patients surviving more than 5 years.  *Id.*  Further improvement in survival has been seen in the years since the introduction of second-generation TKIs like Tasigna®:  survival rates have improved to 66.9% of patients surviving more than 5 years (as of 2013).  *Id.*  Even with the availability of multiple different TKI therapies, as of 2014, almost 30% of patients diagnosed with CML do not survive more than 5 years from diagnosis.  *Id.*

    **b.   Mr. Lauris' CML became resistant to multiple treatments before Tasigna®.**

In January 2001, Dr. Klaus Hoffmann diagnosed Mr. Lauris with CML at the age of 36.  SUF 9.  Dr. Hoffmann started Mr. Lauris on a cytotoxic drug called hydroxyurea (to reduce the

1   number of white blood cells) and interferon in an attempt to control his disease – then the

2   standard of care in CML, but no suitable match for a bone marrow transplant was found.  SUF

3   10-12.  Unfortunately, Mr. Lauris' CML progressed to the blastic phase while on interferon,

4   requiring his hospitalization in May and June 2002 to receive chemotherapy.  SUF 13.  Mr. Lauris

5   developed congestive heart failure during this hospitalization (at age 37).  SUF 14.  After

6   emerging from blastic phase and post-chemotherapy, Dr. Hoffmann began Mr. Lauris on the

7   newly available medication Gleevec® in July 2002.  SUF 15.  Mr. Lauris maintained a good

8   response to Gleevec® for a decade, but in 2012 his CML developed resistance to the medication.

9   SUF 15-16.   Dr. Hoffmann determined that Mr. Lauris' CML had progressed using a test for the

10  presence of the gene that causes CML – the BCR-ABL gene.  SUF 16.  The level of BCR-ABL

11  had gone from being undetectable and, according to Dr. Hoffmann, had "increased by a factor of

12  20," leading him to conclude that a switch from Gleevec® was indicated for Mr. Lauris' CML.

13  SUF 16.

14            c.   **For years before he received Tasigna®, Mr. Lauris had a long history of**
                   **multiple risk factors for cardiovascular disease, the number one cause of**
15                 **death in the United States.**

16        Cardiovascular disease ("CVD") (including stroke, atherosclerosis and peripheral arterial

17  occlusive disease ("PAOD")[1]) has accounted for more deaths than any other major cause of death

18  in the United States for nearly a century and afflicts more than one third of American adults.  SUF

19  17.  According to the American Heart Association, risk factors that contribute to the development

20  of CVD include family history, diabetes mellitus, obesity, high blood pressure, high lipids, and a

21  sedentary lifestyle.  SUF 18, 25.  Having one major risk factor increases the lifetime risk for CVD

22  from 1.4% to 39.6% for men, while having two or more major risk factors further increase the

23  lifetime risk for men to 49.5%.  SUF 19.  High blood pressure is the single greatest risk factor for

24  cardiovascular mortality in the U.S., and diabetes approximately doubles the mortality rate

25  associated with CVD.  SUF 20-21.

26        Atherosclerosis is a type of cardiovascular disease in which fatty deposits called plaques

27

28  [1] Some clinicians prefer the term peripheral arterial disease ("PAD").  SUF 23.

build up in the arteries.  SUF 22, 105.  As plaques build up, the artery wall thickens, narrowing

the passage through which blood flows.  SUF 22, 118.  The specific arteries affected and the

location of the plaques can vary from person to person.  SUF 22.  Atherosclerosis is sometimes

described with terms indicating the particular affected artery, such as peripheral artery disease

(limbs), coronary artery disease (heart), and carotid artery disease (brain).  SUF 22, 106.

Atherosclerosis is a progressive disease that can advance rapidly in some people, and slowly in

others.  SUF 22, 118.   It is a systemic disease, meaning that if an individual has disease in one

vessel, other vessel beds are also affected.  SUF 22, 116.   The presence of atherosclerosis in one

location is associated with its presence in other arteries.[2] SUF 24, 117.

Mr. Lauris had multiple risk factors for atherosclerosis prior to commencing Tasigna®

therapy, most notably diabetes and hypertension.  SUF 25.[3]  Mr. Lauris was noted to have high

blood pressure and diabetes in August 2003, and at additional doctor visits in 2004.  SUF 28.   In

February 2005, Dr. Hoffmann prescribed Mr. Lauris a beta-blocker for his blood pressure, but

Mr. Lauris did not begin to take the medication until March of 2006.  SUF 29-30.   In March

2006, Dr. Hoffmann noted that "[d]iabetes control is a major issue."  SUF 31.  By November

2007, Mr. Lauris had started diabetes medication to try to improve glycemic control.  SUF 32.

Dr. Hoffmann predicted that month that "the unattended diabetes" and "hypertension which is not

taken seriously" would cause [Mr. Lauris] "morbidity and suffering" given that the CML may be

controllable for "many years to come."  SUF 33.

By January 2012, there was evidence that Mr. Lauris had impaired kidney function, a

known vascular complication of uncontrolled diabetes.  SUF 34-35.  He saw a kidney specialist, a

nephrologist, for his chronic kidney disease and objective evidence of his kidney disease –

arterionephrosclerosis – was observed later at his autopsy.[4]  SUF 37-38.  Arterionephrosclerosis is

---

[2] Peripheral artery disease also is a marker for systemic atherosclerotic disease.  SUF 24.

[3] The earliest available medical record documenting elevated blood sugar is from 2001 upon
discharge from the hospital for pancreatitis (a recurring condition for him).  SUF 26.

[4] Mr. Lauris was found to have atherosclerosis in the arteries supplying his heart at autopsy, but
Mr. Lauris never experienced any problems as a result of this subclinical post-mortem finding,
and therefore it is not the basis for any injury claim in this case.  SUF 103.

hardening and narrowing of the blood vessels in the kidneys that results in kidney tissue becoming fibrotic, a chronic finding that develops over years.  SUF 39.  Mr. Lauris indicated in January 2012 that he "considered stopping alcohol altogether and he will resume exercises which he had not been doing at all."  SUF 34.  Dr. Hoffmann did not refer Mr. Lauris to an endocrinologist – a physician whose specialty focuses on the care of patients with diabetes – for more than nine years after his diagnosis with diabetes in 2003.  SUF 40.  By 2012, Mr. Lauris' hemoglobin A1C, a measure of average diabetes control over an approximately 3 month period, was 9.0, indicative of poor control.  SUF 36.  At the time of his CML diagnosis in 2001, Dr. Hoffmann noted in Mr. Lauris' family history that his father had required a coronary artery bypass at least three years earlier, and that Mr. Lauris had a history of diabetes on his maternal side.  SUF 41.

## II.   DR. HOFFMANN'S DECISION TO PRESCRIBE TASIGNA

### a.   Tasigna® was a second-line TKI therapy for Mr. Lauris.

Although the introduction of Gleevec® revolutionized treatment for CML, many patients do become resistant to the drug after years of use.  As Mr. Lauris' oncologist Dr. Hoffmann put it, "everyone who lives long enough has a very high probability of his disease becoming resistant to Gleevec."  SUF 42.  Tasigna® (nilotinib) was initially approved on October 29, 2007, as a second-line therapy for CML patients who had failed Gleevec® therapy.[5]  SUF 43.  The FDA approved Tasigna® using their "Accelerated Review" program, 21 CFR 314.510, based on Tasigna®'s demonstrated effectiveness for an unmet medical need.  SUF 44.  Dr. Hoffmann prescribed Tasigna® to Mr. Lauris on October 18, 2012, after Mr. Lauris' BCR/ABL level had been increasing for several months, indicating progression of his disease despite the Gleevec® therapy that had been successful for ten years.  SUF 46.  Tasigna® represented a third-line therapy for Mr. Lauris, having previously failed interferon and Gleevec®.  SUF 11, 16, 46..  After six weeks of Tasigna® therapy, Mr. Lauris' BCR/ABL level returned to zero, indicating that the

---

[5] In June 2010, FDA approved Tasigna® for first-line use in patients with newly diagnosed CML in chronic phase.  However, first-line use of Tasigna® is not relevant to this case.  *See* NPC's MIL No. 5.

presence of the CML gene was not detected.  SUF 48.  Unfortunately, Mr. Lauris' BCR/ABL increased again on two consecutive tests in September and October 2013 while on Tasigna®.  As a result, Dr. Hoffmann switched Mr. Lauris to a *third* TKI medication, Sprycel®, on November 4, 2013.  SUF 49-50.

### b.   The warnings available to Dr. Hoffmann while prescribing Tasigna®

### i.   The Tasigna® prescribing information

The prescribing information for Tasigna® clearly discloses in Section 1 that Tasigna® was approved on an accelerated basis, without the benefit of more complete data from larger "phase three" studies, as is required under normal procedures.  SUF 53.  Such a disclosure indicates to prescribers that the risk profile for Tasigna® was still evolving, and that the labeling did not necessarily include all risks that might ultimately be found after completion of clinical trials and extensive post-marketing experience.[6]  SUF 54.

NPC first identified a "weak signal"[7] of peripheral arterial occlusive disease ("PAOD") in Tasigna® users in 2010, SUF 56, and during the course of the annual label update process in 2011, NPC proposed adding PAOD to the Tasigna® prescribing information in Adverse Reactions, Section 6, SUF 57.  NPC submitted a Clinical Safety Expert Statement providing FDA with data and analysis that NPC received regarding reports of PAOD in patients who received Tasigna®.  SUF 58.  The FDA approved the addition of PAOD to Section 6.2 (titled Adverse Reactions, Additional Data from Clinical Studies) of the prescribing information in November 2011.  SUF 59.  A FDA memo shows that the agency conducted a review of the available data regarding PAOD and agreed with the inclusion of PAOD in Section 6.2.  SUF 60.  NPC had also requested that FDA approve the addition of information regarding PAOD and its symptoms to

---

[6] Accelerated approvals are well-known to oncologists; 49 oncology approvals were made on an accelerated basis between 1995 and 2010.  SUF 55.

[7] A "signal" is defined by the FDA as "a concern about an excess of adverse events compared to what would be expected to be associated with a product's use."  U.S. Dep't of Health & Hum. Servs., Food & Drug Admin., Good Pharmacovigilance Practices and Pharmacoepidemiologic Assessment (Mar. 2005), at
https://www.fda.gov/downloads/regulatoryinformation/guidances/ucm126834.pdf.

Tasigna®'s Medication Guide for patients.  SUF 61.  FDA rejected NPC's proposed addition to the Medication Guide.  SUF 62-63.

The April 2012 Tasigna® prescribing information, which Dr. Hoffmann reviewed before first prescribing Tasigna® to Mr. Lauris, contained the information about PAOD in Section 6.2 that FDA approved in November 2011.  SUF 64.  That prescribing information included additional information concerning other cardiovascular disease events, as well as warnings concerning conditions from which Mr. Lauris already suffered.  *Id.*  Specifically, the April 2012 Tasigna® prescribing information includes warnings about:

- diabetes mellitus, hyperglycemia, hypercholesterolemia and hyperlipidemia, which were listed as common Metabolism and Nutritional Disorders (Section 6.2);

- intercranial hemorrhage, which was listed as an uncommon Nervous System Disorder (Section 6.2);

- cardiac failure and coronary artery disease, which were listed as uncommon Cardiac Disorders (Section 6.2);

- myocardial infarction, which was listed as a Cardiac Disorder of unknown frequency (Section 6.2); and

- PAOD, which was listed as an uncommon Vascular Disorder (Section 6.2).

*Id.*  Additional relevant information contained in the prescribing information includes:

- The Warnings and Precautions Section, which stated: "The use of Tasigna® can cause increases in serum lipase.  Caution is recommended in patients with a previous history of pancreatitis" (Section 5.4);[8]

- The Section regarding use in patients with Cardiac Disorders, which stated: "In the clinical trials, patients with a history of uncontrolled or significant cardiovascular disease, including recent myocardial infarction, congestive heart failure, unstable angina or clinically significant bradycardia, were excluded.  Caution would be exercised in patients with relevant cardiac disorders" (Section 8.6); and

---

[8] Mr. Lauris had a history of recurrent pancreatitis requiring surgery.  SUF 27.

- The "Monitoring Laboratory Tests" section 5.13, which stated that "Chemistry panels, including the lipid profile, should be checked periodically."

SUF 64.  All of these warnings were present in the prescribing information that Dr. Hoffmann testified that he consulted when he prescribed Tasigna® to Mr. Lauris in October 2012.

In December 2012, less than two months after Mr. Lauris was started on Tasigna®, "Arteriosclerosis" was added to the uncommon category of events listed in the "Vascular disease" section of Section 6.2 of the label.  SUF 65.  NPC made this addition in its annual labeling updates, which were provided as a part of Tasigna®'s accelerated approval and provided FDA with updated data from ongoing studies as well as adverse events reported to NPC.  SUF 51-52, 65.

In January 2014, after Mr. Lauris stopped receiving Tasigna®, the FDA approved the addition of a new warning section 5.4, Cardiac and Vascular Events.  The section included data on the incidence of PAOD, ischemic cerebrovascular events, and ischemic heart disease-related events in patients receiving Tasigna® in ENESTnd.[9]  SUF 66.  In particular, the January 2014 label reported the low incidence of ischemic cerebrovascular events *after four years of follow-up* in the ENESTnd study:  1.1% and 1.8% in the nilotinib 300mg and 400mg twice per day arms, and 0.7% in the imatinib arm.  SUF 67.  Stroke/transient ischemic attack incidence *per year* in the general population ages 45-74 is 2.4 to16.2 per 1000 person years.  SUF 68.

### ii.  Medical literature

By October 2012 when Dr. Hoffmann first prescribed Tasigna® to Mr. Lauris, there were at least five scientific publications in the public literature that evaluated cases of PAOD or other atherosclerotic vascular events in patients treated with Tasigna®.  SUF 69.  Of note, a published abstract presented at the American Hematological Society in December 2011 reported that six cases of PAOD had been detected in patients treated with Tasigna® during the ENESTnd clinical trial up to that point, compared to 6 cases of PAOD in patients treated with Gleevec® and 3 cases of PAOD in TKI naïve patients.  SUF 74.  Dr. Hoffmann testified that he was not aware of this

---

[9] ENESTnd stands for Evaluating Nilotinib Efficacy and Safety Trial-Newly Diagnosed.

literature in 2012 when he prescribed Mr. Lauris Tasigna®.  SUF 75.

### c.   Dr. Hoffmann did not testify that he would have changed his prescribing decision based on the FDA-approved warning in January 2014.

Dr. Hoffmann had a phone conversation in February 2016, before this case was filed, where he responded to questions posed to him by plaintiffs' counsel.  Dr. Hoffmann kept notes of that initial conversation with plaintiffs' counsel, which he produced at his deposition.  Those initial notes specifically address what, if anything, Dr. Hoffmann would have done differently had he been aware in 2012 that Tasigna® "markedly increased" atherosclerosis:

> [Q]uestion, what would you have done differently if you had known the
> risks of Nilotinib of markedly increased of, [] of atherosclerosis when you
> prescribed it for Dainis Lauris?  [] Stopped it and used alternative --
> alternatives *when his symptoms of vascular insufficiency arose*.

SUF 76.  Plaintiffs' counsel noticed Dr. Hoffmann's deposition, and then spent the two days before Dr. Hoffmann's third-party fact witness deposition meeting with him to prepare.  SUF 77. The day following those meetings, at his deposition, when asked point blank by plaintiffs' counsel whether "Had you known of those risks, would you have prescribed Tasigna® to Mr. Lauris?," Dr. Hoffmann responded:  "Probably not. . . .  But I don't know that.  That's hypothetical."  SUF 78.

Pressed further, plaintiffs' counsel succeeded in getting Dr. Hoffmann to state that if he had seen the Canadian label and received a Dear Doctor Letter he would not have prescribed Tasigna®.  SUF 82.  The current U.S. prescribing information is different from the Canadian label on atherosclerosis and no Dear Doctor Letter has been required on atherosclerosis in the U.S. SUF 79-81.  However, when questioned by counsel for NPC about whether certain information would have changed his prescribing decision, his answer included that "it remains hypothetical," and he repeated this answer throughout the deposition.  SUF 87.

The sum of Dr. Hoffmann's testimony suggests that he *would have still prescribed Tasigna® to Mr. Lauris even had he received Tasigna®'s current FDA-approved labeling back in 2012.*  For example, Dr. Hoffmann testified that he performs a risk-benefit analysis before

**NPC'S MPA ISO MOTION FOR SUMMARY JUDGMENT - Case No. 1:16-cv-00393-SEH**

1    prescribing cancer therapies.  SUF 83.  Here, Mr. Lauris had failed on Gleevec®, and the only two

2    other options Dr. Hoffmann considered were Sprycel® and Tasigna®.  But Dr. Hoffmann stated

3    clearly that he can't say that he would have chosen the only other alternative, Sprycel®.  SUF 84.

4    And when asked what he would have done differently in hindsight had he prescribed Tasigna®,

5    Dr. Hoffmann testified only that he "would have watched [Mr. Lauris] for that particular side

6    effect."  SUF 85.  Such a course of action would not have prevented Mr. Lauris from developing

7    a side-effect from Tasigna®.  Moreover, Dr. Hoffmann has testified that even the FDA-approved

8    2014 version of the Tasigna® prescribing information—*which included a Cardiac and Vascular*

9    *Events warning*  including PAOD, ischemic cerebrovascular events, and ischemic heart disease—

10   would not have been sufficient for him to change his prescribing decision.  SUF 82.

11   **III.    MR. LAURIS DIED ON MARCH 31, 2014, AS A RESULT OF A BLEEDING**
          **COMPLICATION OF A VASCULAR PROCEDURE PERFORMED BY DR.**
12        **RANDALL STERN.**

13          On July 18, 2013, Mr. Lauris's diabetes specialist nurse observed diminished circulation

14   in his lower legs, and Mr. Lauris documented cramping, tightening and pain in his legs with

15   exercise, called "claudication."  SUF 88.  In September 2013, a vascular surgeon prescribed

16   medication to Mr. Lauris to manage his claudication and recommended to not pursue a surgical

17   course.  SUF 89-90.  Two months later, a second vascular surgeon, Dr. Randall Stern, who Mr.

18   Lauris sought out because Dr. Hoffmann thought the first treatment plan was too conservative,

19   SUF 91, performed surgery – a right femoral to popliteal in situ bypass graft and right profunda

20   femoris endarterectomy with separate ateriotomy and vein patch angioplasty –to improve the

21   circulation in Mr. Lauris' right leg.  SUF 92.  Mr. Lauris required follow-up surgery (a revision) a

22   few days later to close off a fistula that had been left during the first procedure.  SUF 93.  On

23   March 28, 2014, Dr. Stern performed a different surgery on Mr. Lauris' left leg at Dr. Stern's

24   outpatient catheterization clinic (the previous surgery was performed at Fresno Heart & Surgical

25   Hospital).  SUF 94.  The procedure involved puncturing Mr. Lauris' femoral artery on the right

26   leg to insert a sheath, and then passing the sheath over to the femoral artery in the left leg where

27   the procedure was performed.  Dr. Stern noted that the puncture site was high, which increases

28   the risk of bleeding complications.  SUF 95.  During that surgery Dr. Stern allowed his staff to

1   remove the femoral artery sheath when the Activated Clotting Time ("ACT") count was higher

2   than 200, which also puts a patient at risk for bleeding.  SUF 96.  Dr. Stern admitted at his

3   deposition that removing the femoral artery sheath at that point in time was against his own

4   protocol and standards of practice.  *Id.*   As a result of the procedure, Mr. Lauris experienced

5   severe bleeding from his femoral artery, which was not detected for three hours.  SUF 98.  Mr.

6   Lauris was then transferred to the emergency room at St. Agnes Hospital, where Dr. Stern

7   performed a two-hour surgery, 1 hour and 40 minutes after it was determined Mr. Lauris needed

8   to be transferred to the emergency room to repair a puncture to the femoral artery that had caused

9   a retroperitoneal hematoma.  SUF 99.  Dr. Stern estimated that Mr. Lauris lost 1.5 liters of blood

10  during the repair procedure.  SUF 100.  Mr. Lauris received a total fourteen units of blood

11  products at the hospital in an attempt to replace the blood lost from the arterial bleeding.  SUF

12  101.  The patient did not awaken after his second surgery, and on March 29 experienced strokes

13  in multiple locations in his brain (that are supplied by different arteries) and ultimately passed

14  away on March 31, 2014.  SUF 102.

15  **IV.  BY NOVEMBER 2013, MR. LAURIS KNEW THAT HE HAD**
16  **ATHEROSCLEROSIS, WHICH HE BELIEVED TO BE ACCELERATED AND**
    **DIFFUSE AND CAUSED BY TASIGNA®.**

17       Both Dr. Hoffmann's testimony and Mr. Lauris' personal notes reveal that Mr. Lauris

18  knew in November 2013 that his atherosclerotic condition was potentially related to his Tasigna®

19  use.  SUF 104.  Dr. Hoffmann testified that atherosclerosis is a systemic condition in which

20  plaque builds up in the arteries of the body.  SUF 105.  Atherosclerosis includes peripheral

21  arterial disease, coronary artery disease, and cerebral atherosclerosis, and can affect all arteries in

22  the body.  SUF 106.  Mr. Lauris also knew at that time that Tasigna may be responsible for

23  accelerated atherosclerosis and that his atherosclerotic condition was both "severe" and

24  "accelerated".  SUF 107-108, 114-115.[10]  Mr. Lauris' atherosclerotic condition was not limited to

25  _____

26  [10] Mr. Lauris, in his personal notes, wrote that by March 8, 2013, his "[b]ottom right lip and right
    hand thumb/ wrist area are feeling numb."  SUF 114.  This did, or should have, put Mr. Lauris on
27  notice, if he was not already, of the possibility that he had atherosclerosis in the arteries supplying
    blood to his brain.  This entry for March 8, 2013 in his notes corresponds to more than two-years
28  before the March 22, 2016 filing of this case (Doc. No. 1).

1   his legs.  SUF 111, 115.  On November 18, 2013, Mr. Lauris underwent an ultrasound of his

2   carotid arteries in his neck that revealed the presence of calcified plaque in the right external

3   carotid artery.  SUF 115.

4       As of November 2013, Dr. Hoffmann believed Mr. Lauris' condition to be rapidly

5   progressive and to involve multiple areas of the body—not just the legs.  He immediately

6   conveyed this message to Mr. Lauris, as well as the message that the condition was potentially

7   related to Tasigna®.  SUF 104, 107.

8   **SUMMARY JUDGMENT STANDARD**

9       The Federal Rules provide for summary judgment when "there is no genuine issue as to

10  any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

11  56(a).  Although facts must be construed in favor of the party opposing summary judgment, the

12  non-movant cannot rest on allegations and "must do more than simply show that there is some

13  metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

14  475 U.S. 574, 586 (1986).  When deciding such motions, courts cannot consider inadmissible

15  evidence.  Furthermore, courts must "view the evidence presented through the prism of the

16  substantive evidentiary burden," so there must be sufficient evidence on which a jury could

17  reasonably find for the plaintiff.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986).

18  "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but

19  rather as an integral part of the Federal Rules [of Civil Procedure]."  *Celotex Corp. v. Catrett*, 477

20  U.S. 317, 327 (1986).  "The mere existence of a scintilla of evidence in support of the plaintiff's

21  position will be insufficient" to defeat a defendant's summary judgment motion.  *Anderson*, 477

22  U.S. at 252.

23  **ARGUMENT**

24  **I.    PLAINTIFFS' SURVIVOR CLAIMS (AND RELATED PUNITIVE DAMAGES**

25  **      RELIEF) ARE BARRED BY THE STATUTE OF LIMITATIONS.**

26      A two-year statute of limitations governs personal injury survivor claims in California.

27  *See* Cal. Civ. Proc. Code § 335.1; *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 809 n. 3

28  (2005).  The statute of limitations "bars untimely personal injury claims based on defective

1   products regardless of the particular legal theory invoked," *Soliman v. Philip Morris Inc*., 311

2   F.3d 966, 971 (9th Cir. 2002) (citing cases); *Erickson v. Boston Sci. Corp*., 846 F. Supp. 2d 1085,

3   1094 (C.D. Cal. 2011) (citing *Soliman*, 311 F.3d at 971), and thus requires "plaintiffs to pursue

4   their claims diligently." *Fox*, 35 Cal. 4th at 806.

5          The "rule in California is that a statute of limitations begins to run when a cause of action

6   accrues." *M & F Fishing, Inc. v. Sea-Pac Ins. Managers, Inc*., 202 Cal. App. 4th 1509, 1531

7   (2012) (quotation marks omitted).  In general, "a cause of action accrues at 'the time when the

8   cause of action is complete with all of its elements,'" typically when the injury occurs.  *Fox*, 35

9   Cal. 4th at 806-7 (quoting *Norgart v. Upjohn Co.*, 21 Cal. 4th 383, 397 (1999)).

10         In this case, a cause of action accrued no later than November 2013, when Dr. Hoffmann

11  formed his belief that Mr. Lauris had rapidly progressive atherosclerotic disease and that

12  Tasigna® could cause atherosclerosis involving multiple areas of the body—not just the legs.

13  SUF 112.  He immediately conveyed this message to Mr. Lauris on November 11, 2013, as well

14  as the message that Mr. Lauris' "diffuse" atherosclerotic condition was potentially related to

15  Tasigna®.  SUF 104.  In the following months (prior to March 2014), Mr. Lauris generated

16  personal handwritten notes, which he later had Mrs. Lauris type, documenting the timeline of his

17  symptoms while on Tasigna® and the events at issue in this case.  SUF 109.  Mr. Lauris also had

18  an ultrasound conducted of his carotid arteries in his neck in November 2013, which showed mild

19  calcified atherosclerotic plaque.  SUF 115.  All of this information was known to Mr. Lauris more

20  than two years before this action was commenced.  Mr. Lauris, who worked as a pharmaceutical

21  sales representative, also visited a website with a message board, where he reviewed and posted

22  regarding Tasigna® and his belief that his atherosclerosis was caused by Tasigna®.  SUF 113.

23  These facts are sufficient to commence the running of the statute of limitations.  *See Hendrix v.*

24  *Novartis Pharm. Corp.*, 647 Fed. App'x. 749 (9th Cir. 2016) (affirming dismissal of time-barred

25  claims where any reasonable jury would conclude that the plaintiff knew or should have

26  suspected that the medication at issue had caused his injuries more than two years before he filed

27  his complaint); *Carroll v. Bristol Park Med. Grp., Inc.*, No. G046113, 2012 WL 5328740, at *1

28  (Cal. Ct. App. Oct. 29, 2012) ("A plaintiff may not wait until the ultimate harm occurs or the

1    completion of all damages before filing suit, but rather must sue once any actual and appreciable

2    harm caused by a doctor's negligence manifests itself.").  Mr. Lauris was aware of his diagnosis

3    with atherosclerosis and he believed Tasigna® to be a cause of systemic, diffuse atherosclerosis.

4    Thus, the statute of limitations on all of his claims necessarily ran by November 2015; plaintiffs'

5    suit was not filed until March 2016.

6         Plaintiffs' survival claims are not just barred because Mr. Lauris knew or should have

7    known of the systemic nature of his atherosclerosis, but also because his alleged injury –

8    atherosclerosis – has a single etiology.  Under California law, a narrow exception to the single

9    two-year statute of limitations has been recognized for the situation in which a plaintiff can prove

10   that he suffered a second later injury that is the result of a separate latent disease etiology.  *Pooshs*

11   *v. Philip Morris USA, Inc.*, 51 Cal. 4th 788, 802 (2011).  In June 2016, prior to fact discovery,

12   NPC moved to dismiss on the pleadings plaintiffs' survivor claim as time-barred (Dkt. 33).  The

13   Magistrate Judge who previously heard this issue determined that "[t]he question to be considered

14   in this matter is whether the discovery that decedent's atherosclerosis effected his cerebral arteries

15   is a separate and distinct injury from the earlier discovered atherosclerosis in his legs."  *See*

16   Findings and Recommendations Recommending Denying Defendants' Motion to Dismiss at 8:2-

17   4 (E.D. Cal. July 22, 2016), ECF No. 48.

18        The subsequent discovery in this case shows that the answer to that question is a

19   resounding "no."  Plaintiffs' experts and treating physicians are in agreement that atherosclerosis

20   is a single disease with a common etiology.  SUF 116, (Dr. Hoffmann: atherosclerosis can occur

21   in arteries of the legs, heart, and brain), 117 (Dr. Wagmeister: atherosclerosis is a systemic

22   process that affect any artery in the body), 118 (Dr. Weiss: atherosclerosis can affect the arteries

23   throughout the body, not just in any one place), 119 (Dr. Chen: "atherosclerosis is usually

24   multifocal, involves multiple organs, blood vessels in multiple organs").  Even though plaintiffs'

25   expert, Dr. Wagmeister, attempts to draw distinctions based on the location of the atherosclerosis

26   and the different types of doctors that specialize in surgery to the different arteries throughout the

27   body, these distinctions do not give rise to a different scientific etiology as required by *Pooshs* to

28

1    permit a new statute of limitations.  51 Cal. 4th 793 (noting that it was uncontested in *Pooshs* that

2    the two alleged injuries had "distinct" etiologies).

3          Here, since Mr. Lauris was alerted that his atherosclerotic condition may have been

4    attributable to Tasigna® well before March 2014 (by November 2013 at the latest), his survivor

5    claims brought in March 2016 are time-barred.  *See* Cal. Civ. Proc. Code § 335.1.   And, since

6    punitive damages are only available in survivor claims (not wrongful death claims), *see Estate of*

7    *McNeil v. Freestylemx.com, Inc.*, 177 F. Supp. 3d 1260 (S.D. Cal. 2016), plaintiffs' requested

8    punitive damages relief is clearly time-barred as well.[11]

9          In the alternative, to the extent this Court rules that Mr. Lauris did not know or should not

10   have known of the systemic nature of atherosclerosis in November 2013 and that atherosclerosis

11   in the arteries of the legs (PAOD) and the brain (intracranial atherosclerosis) are separate and

12   distinct injuries, then plaintiffs' PAOD-based claims are still precluded as time-barred.  Because

13   plaintiffs' claims regarding PAOD are untimely, even if plaintiffs' survivor claims are not barred

14   in their entirety, plaintiffs may only seek damages related to cerebral atherosclerosis (the stroke)

15   and will not be able to recover for any medical costs pre-dating the stroke.

16   **II.    PLAINTIFFS' FAILURE TO WARN CLAIMS – AND THUS ALL OF THEIR**
         **CLAIMS – CANNOT SURVIVE SUMMARY JUDGMENT BECAUSE NPC**
17       **PROVIDED AN ADEQUATE WARNING AND BECAUSE PLAINTIFFS**
         **CANNOT SHOW THAT A DIFFERENT WARNING WOULD HAVE**
18       **PREVENTED MR. LAURIS' ALLEGED INJURY.**

19         Plaintiffs' claims hinge upon their contention that NPC failed to warn of the potential risk

20   of atherosclerosis with Tasigna® treatment.  A manufacturer of a prescription drug is obligated to

21   warn physicians, not patients, of known or reasonably knowable side effects of its drug.  *Motus v.*

22   *Pfizer Inc.*, 196 F. Supp. 2d 984, 991 (C.D. Cal. 2001) (applying California law), *aff'd*, 358 F.3d

23   659, 660-61 (9th Cir. 2004).  To prevail on a failure to warn claim, a plaintiff must prove that "no

24   warning was provided or the warning was inadequate," and "also that the inadequacy or absence

25   of the warning caused the plaintiff's injury."  *Id.* at 991.  Here, the prescribing information was

26   ──────────────────────
     [11] To the extent any punitive damages relief survives, NPC asserts in its contemporaneously filed
27   briefing that New Jersey substantive law should apply and that plaintiffs cannot support such a
     claim.  Even if California law applies, plaintiffs' evidence in support of malice – discussed in
28   plaintiffs' MIL No. 4 (Doc. No. 128) – is insufficient to create a genuine issue of material fact.

1   adequate to warn Dr. Hoffmann of the risks of Tasigna® known at the time; and even if it was not,

2   such inadequacy was not the proximate cause of Mr. Lauris' death because (1) Dr. Hoffmann

3   would have prescribed Tasigna®, even if he had received the warning that FDA approved in

4   January 2014 after Mr. Lauris stopped receiving Tasigna®, and (2) Mr. Lauris would not have

5   died but for medical malpractice unrelated to Tasigna®.

6   　　　　　　**a.　NPC's warning was adequate as a matter of law.**

7   　　　　NPC has a duty to provide an objectively reasonable warning; it has no duty to meet the

8   subjective warning standards of plaintiffs' experts (Weiss and Blume).  Under California law,

9   "[a]n adequate warning is a sufficient defense to a strict liability action."  *Temple v. Velcro USA,*

10  *Inc.*, 148 Cal. App. 3d 1090, 1094 (1983).  If a warning is adequate, it "negate[s] any negligence

11  or willful misconduct."  *Id.*  Under the learned intermediary doctrine, a drug manufacturer's duty

12  to warn is satisfied if it adequately warns the plaintiffs' prescribing physician of a risk that is

13  "known or reasonably scientifically knowable at the time of distribution."  *Brown v. Superior*

14  *Court*, 44 Cal. 3d 1049, 1069 (1988); *id.* at 1062 n.9 ("It is well established that a manufacturer

15  fulfills its duty to warn if it provides adequate warning to the physician."); *see also Motus v.*

16  *Pfizer Inc.*, 196 F. Supp. 2d 984, 990-91 (C.D. Cal. 2001) ("[A] manufacturer discharges its duty

17  to warn if it provides adequate warnings to the physician about any known or reasonably

18  knowable dangerous side effects").

19  　　　　Here, NPC's duty was to warn of the risk of atherosclerotic events knowable as of

20  October 2012 when Mr. Lauris was prescribed Tasigna®.  Whether a warning should be provided

21  as to a particular potential side-effect depends on the scientifically-established causal link known

22  at the time.  In *Finn v. G. D. Searle & Co.*, the California Supreme Court explained that

23  　　　　　　[i]f we overuse warnings, we invite mass consumer disregard and
        ultimate contempt for the warning process. . . . Moreover, both
24      common sense and experience suggest that if every report of a
        possible risk, no matter how speculative, conjectural, or tentative,
25      imposed an affirmative duty to give some warning, a manufacturer
        would be required to inundate physicians indiscriminately with
26      notice of any and every hint of danger, thereby inevitably diluting
        the force of any specific warning given. The strength of the causal
27      link thus is relevant both to the issue of whether a warning should
        be given at all, and, if one is required, what form it should take.
28

1  35 Ca1. 3d 691, 701 (1984) (internal quotation marks omitted) (citations omitted); *see also Rosa*

2  *v. Tazer Int'l, Inc.*, 684 F.3d 941, 946 (9th Cir. 2012) (alteration in original) (relying on *Finn*)

3  ("[A] manufacturer is not under a duty to warn of 'every report of a possible risk, no matter how

4  speculative, conjectural, or tentative,' because 'inundat[ing the public] indiscriminately with

5  notice of any and every hint of danger' would 'inevitably dilut[e] the force of any specific

6  warning given.'").

7       Additionally, "[i]n appropriate cases, FDA action or inaction, though not dispositive, may

8  be admissible . . . to show whether a risk was known or reasonably scientifically knowable."

9  *Carlin v. Superior Court*, 13 Cal. 4th 1104, 1114–15 (1996).  "[A] drug manufacturer could

10  present evidence to show that there was no 'reasonably scientifically knowable risk' because, at

11  the time of distribution, the cause of the alleged adverse effect was too speculative to have been

12  reasonably attributable to the drug by a scientist conducting state-of-the-art research."  *Id.*  And in

13  the case of an alleged "known" risk, if state-of-the-art scientific data concerning the alleged risk

14  was fully disclosed to the FDA and it determined, after review, that the pharmaceutical

15  manufacturer was *not permitted to warn*—e.g., because the data was inconclusive or the risk was

16  too speculative to justify a warning—the manufacturer could present such evidence to show that

17  strict liability cannot apply.  *Id.* at 1353 (noting that considerations of reasonableness sounding in

18  negligence apply in the pharmaceutical strict liability context).

19       Here, NPC first recognized a possible signal associated with PAOD in 2010, and in 2011

20  specifically asked the FDA if it could warn about PAOD.  NPC proposed two additions to the

21  labeling – one in Section 6.2 regarding adverse events and the other to the Medication Guide for

22  patients.  SUF 57 and 61.  FDA approved the change to Section 6.2, but rejected the addition of

23  PAOD to the Medication Guide based on the fact that PAOD was not in the Warnings and

24  Precautions section.  SUF 59 and 62.  FDA prepared a memorandum in October 2011 titled "the

25  Addition of Peripheral Arterial Occlusive Disease to the Package Insert" in which it analyzed the

26  available data and concluded that the "addition of peripheral arterial occlusive disease to Section

27  6.2 of the PI is acceptable."  SUF 60.  Thus, FDA knew that PAOD would be added to Section

28  6.2 but it did not require it to be added to the Warnings and Precautions section.  As evidenced by

FDA's memorandum and its decision to approve Tasigna®'s updated labeling, after considering all the evidence, the FDA concluded that the data:

> suggest that nilotinib does not markedly increase the risk of PAOD in patients being treated for Philadelphia chromosome positive leukemia.  Thus the addition of peripheral arterial occlusive disease to Section 6.2 of the PI is acceptable.

SUF 63.  Thus, any argument that the warning should have been placed elsewhere, such as in Section 5 or in a boxed warning, is preempted and therefore inadmissible, as argued in NPC's contemporaneously filed Motion in Limine No. 1 to Exclude Evidence and Argument concerning Labeling issues controlled by the FDA.

The warning in effect when Dr. Hoffmann prescribed Mr. Lauris Tasigna® adequately conveyed what was known at the time.  To be adequate, the warning must "include the potential risks or side effects that may follow the foreseeable use of the product."  *See* Judicial Council of California Civil Jury Instructions (2016 edition) at CACI Nos. 1222 and 1205.  "If the risks involved in the use of the product are unavoidable, as in the case of potential side effects of prescription drugs, the supplier must give an adequate warning to enable the potential user to make an informed choice whether to use the product or abstain."  Comments to CACI No. 1205, *citing Buckner v. Milwaukee Electric Tool Corp*., 222 Cal. App. 4th 522, 532 (2013).  A label is not inadequate simply because some additional information could have possibly been added.  A label is adequate when it provides prescribing physicians with the information that they need to know in order to prescribe the drug at issue.  *Brown*, 44 Ca1. 3d at 1061 ("A physician appreciates the fact that all prescription drugs involve inherent risks, known and unknown, and he does not expect that the drug is without such risks"); *id.* at 1062 n.9 ("[A] manufacturer fulfills its duty to warn if it provides adequate warning to the physician.").

Here, the April 2012 Tasigna® label, which Dr. Hoffmann testified to having reviewed before first prescribing Tasigna® to Mr. Lauris, contains the information about PAOD that FDA approved in November 2011.  SUF 64.  In addition, that label included addition information concerning cardiovascular disease as well as risk factors for atherosclerosis from which Mr. Lauris already suffered before receiving Tasigna®.  SUF 64.  For example:

1   • diabetes mellitus, hyperglycemia, hypercholesterolemia and hyperlipidemia were listed as

2   common Metabolism and Nutritional Disorders (Section 6.2);

3   • intercranial hemorrhage was listed as an uncommon Nervous System Disorder (Section

4   6.2);

5   • cardiac failure and coronary artery disease, which were listed as uncommon Cardiac

6   Disorders (Section 6.2);

7   • myocardial infarction was listed as a Cardiac Disorder of unknown frequency (Section

8   6.2);

9   • PAOD was listed as an uncommon Vascular Disorder (Section 6.2);

10  • the "Monitoring Laboratory Tests" section 5.13 stated that "Chemistry panels, including

11  the lipid profile, should be checked periodically;" and

12  • in the Section regarding use in patients with Cardiac Disorders: "In the clinical trials,

13  patients with a history of uncontrolled or significant cardiovascular disease, including

14  recent myocardial infarction, congestive heart failure, unstable angina or clinically

15  significant bradycardia, were excluded.  Caution would be exercised in patients with

16  relevant cardia disorders" (Section 8.6).

17  SUF 64.  In December 2012, less than two months after Mr. Lauris was started on Tasigna, the

18  label was modified by NPC to add "Arteriosclerosis" to the uncommon category of events listed

19  in the "Vascular disease" section of Section 6.2 of the label.  SUF 65.

20      These Tasigna® label warnings were sufficient to put Dr. Hoffmann on notice of the risk

21  of atherosclerotic conditions known by NPC at the time.  In this case, it is also important to note

22  that the prescribing information for Tasigna® clearly disclosed in Section 1 that Tasigna® was

23  approved on an accelerated basis, without the benefit of evidence from full and complete clinical

24  trials.  SUF 53.  Such a disclosure indicates to prescribers that the risk profile for Tasigna® was

25  still evolving and that the labeling did not necessarily include all risks that might ultimately be

26  found after completion of clinical trials and extensive post-marketing experience.  SUF 54.  As a

27  result, NPC not only continued to provide regular safety updates to FDA, but it also prepared

28  annual label updates.  SUF 51, 52.  NPC also worked with clinical investigators to ensure that

1    data from ongoing clinical studies were presented in the medical literature.  For example, a

2    published abstract presented at the American Hematological Society (the professional medical

3    organization for hematologists in the United States) in December 2011 reported that six cases of

4    PAOD had been detected in patients treated with Tasigna® during the ENESTnd clinical trial up

5    to that point, compared to 6 cases of PAOD in patients treated with Gleevec® and 3 cases of

6    PAOD in TKI naïve patients.  SUF 74.  The authors of this abstract included NPC employees

7    Frank Hong and Richard C. Woodman.[12]

8              **b.  Dr. Hoffmann would have prescribed Tasigna® anyway.**

9              Even if this Court accepts plaintiffs' argument that NPC failed to adequately warn of the

10   potential risk of atherosclerosis, plaintiffs must establish "that the inadequacy or absence of the

11   warning [known in October 2012] *caused* [Mr. Lauris's] injury."  *Motus*, 196 F. Supp. 2d at 991

12   (emphasis added); *see also* Comments to CA Model Instructions Sec. 1205 ("[A] defendant is not

13   liable to a plaintiff if the injury would have occurred even if the defendant had issued adequate

14   warnings.") (citing *Huitt v. Southern California Gas Co.*, 188 Cal. App. 4th 1586, 1604 (2010).

15   In other words, plaintiffs must show that if NPC had provided a different warning Mr. Lauris

16   would not have died.  Where plaintiffs cannot do so, summary judgment is appropriate.  *See, e.g.*,

17   *Georges v. Novartis Pharm. Corp.*, 988 F. Supp. 2d 1152, 1157 (C.D. Cal. 2013) ("If the plaintiff

18   would have taken the drugs and suffered the same injuries, even with an adequate warning, the

19   defendant's failure to warn cannot have caused her injury."); *Eberhart v. Novartis Pharm. Corp.*,

20   867 F. Supp. 2d 1241 (N.D. Ga. 2011) (absent evidence that a change in prescribing practices

21   would have altered the course of the injury defendant is entitled to summary judgment).

22             California imposes the burden on plaintiffs to prove through affirmative admissible

23   evidence that Mr. Lauris' oncologist, Dr. Hoffmann, would not have prescribed Tasigna® for him

---

[12] Plaintiffs may argue that even though the label in effect in 2012 provided information regarding the incidence of PAOD and coronary artery disease in patients who had received Tasigna®, it was still inadequate because it did not warn of ischemic cerebrovascular events specifically. However, as described earlier, *supra* § II.B.i, the incidence of ischemic cerebrovascular events, even after four years of the ENESTnd study is low, and plaintiffs have do not have sufficient data to trigger a duty to warn as of October 2012.  Dr. Singh's meta-analysis of ischemic cerebrovascular events (based on available data at the time of his recent analysis) is not evidence of what was known or knowable in 2012.

1   if different warnings had been given, *see, e.g.*, *Motus*, 196 F. Supp. 2d at 991-96 (California law

2   does not grant plaintiffs any presumptions in meeting their burden of proof on this causation

3   issue), and plaintiffs here have no such evidence.  *See also Jones v. Ortho Pharm. Corp.*, 163 Cal.

4   App. 3d 396, 402 (1985) (under California law, if "speculation or conjecture" is required to prove

5   "proximate cause then the granting of nonsuit is proper").

6            As an initial matter, Dr. Hoffmann's notes indicate that even if he had been aware of a

7   potential risk of atherosclerosis, he would still have prescribed Tasigna to Mr. Lauris until an

8   atherosclerotic event appeared:

9                    [Q]uestion, what would you have done differently if you had known the

10                   risks of Nilotinib of markedly increased of, [] of atherosclerosis when you

11                   prescribed it for Dainis Lauris?  [] Stopped it and used alternative --

12                   alternatives *when his symptoms of vascular insufficiency arose*.

13  SUF 76; *see also* SUF 85 (in hindsight, "would have watched [Mr. Lauris] for that particular side

14  effect").  This evidence indicates that plaintiffs cannot meet their burden with regard to proximate

15  causation to show that Dr. Hoffmann would not have prescribed Tasigna®.  It was not until Dr.

16  Hoffmann's deposition, after meeting with plaintiffs' counsel on two additional days, that he

17  offered testimony that it would be "hypothetical" to determine what he would have done had he

18  had different information in October 2012.  SUF 87.  Speculation about what he might have done

19  does not meet plaintiffs' burden.  *Jones*, 163 Cal. App. 3d at 402.

20           The only testimony that plaintiffs have is that Dr. Hoffmann probably would not have

21  prescribed Tasigna if FDA had approved a label like Canada's along with a Dear Healthcare

22  Provider Letter.  SUF 82, 87.  This argument is preempted as explained in NPC's

23  contemporaneously filed briefing to exclude evidence and argument concerning labeling and

24  reporting issues controlled by the FDA.  NPC's MIL No. 1.  NPC informed FDA of the labeling

25  changes made in Canada, as well as the Canadian regulator's decision in April 2013 to require a

26  Dear Doctor Letter to be sent.  SUF 70.  Even with this information, FDA did not require a

27  warning such as the one issued in Canada or a Dear Doctor Letter.  SUF 66, 81.  In fact, NPC

28  even asked FDA whether under newly issued guidance in January 2014, a Dear Doctor Letter

1    should be sent for the January 2014 label update, and FDA responded that they would have asked

2    for such a letter to be sent if it was required under the guidance.  SUF 81.

3        Where, as here, the plaintiffs lack affirmative evidence that additional warnings

4    permissible under the applicable regulatory scheme would have changed the physician's decision

5    to prescribe the drug, summary judgment will usually follow on all failure-to-warn claims.  *See,*

6    *e.g.*, *Motus*, 196 F. Supp. 2d at 996 ("The burden [is] on the plaintiff to demonstrate that the

7    additional non-disclosed risk was sufficiently high that it would have changed the physician's

8    decision to prescribe the product.") (alteration in original).  In *Motus*, the plaintiff alleged that her

9    husband committed suicide while taking the drug Zoloft®.  *Id.* at 986.  She sought to hold Pfizer

10   liable for her husband's death, claiming that Pfizer failed to warn about the possible association

11   between Zoloft® and an increased risk of suicide.  *Id.*  The court granted summary judgment for

12   Pfizer because the Court held that it was not enough, the court held, for the plaintiff to show that

13   the prescribing physician testified that he would have liked to know that Zoloft® could cause an

14   increased risk of suicide or that the physician would have passed that kind of information on to

15   his patients.  *Id.* at 997.

16       Similarly, in *Nix v. SmithKline Beecham Corp.*, the plaintiff sued GlaxoSmithKline

17   (GSK), alleging that it failed to warn of the risks associated with its drug Serevant®.  No. CV-06-

18   43-PHX-SMM, 2007 WL 2526402, at *1 (D. Ariz. Sept. 5, 2007) (applying California law).  In

19   moving for summary judgment, GSK argued that even if its Serevant® warnings were inadequate,

20   they could not have proximately caused the plaintiffs' injuries because there was no evidence that

21   an adequate warning would have changed the prescribing physician's decision to prescribe

22   Serevant® for the decedent.  *Id.* at *3.  Citing *Motus*, the court concluded:  "Under applicable

23   California law, Plaintiffs must show that additional warnings would have caused Dr. Hoehne not

24   to prescribe Servevant for Mr. Nix.  Even construed in Plaintiffs' favor, the evidence does not

25   support such a finding."  *Id.* at *4.[13]

26   _____

[13] *See also, e.g.*, *Ebel v. Eli Lilly & Co.*, 321 Fed. App'x 350, 357 (5th Cir. 2009) ("Ebel presented
27   no evidence to suggest that Dr. Nett would have changed either his decision to prescribe Zyprexa
     or his risk-benefit analysis had he received some alternative warning concerning Zyprexa. . . .
28   For these reasons, Ebel has failed to show that a genuine issue of material fact exists as to
     whether Lilly's warning was the producing cause of Philip's death."); *Ackermann v. Wyeth*

1    Plaintiffs may attempt to avoid this fatal proximate causation issue by arguing that the

2  drug may have still been prescribed, but with additional warnings that would have prompted the

3  prescriber to take additional steps that might have avoided the event.  Plaintiffs' burden of proof

4  requires affirmative evidence (as opposed to speculation) that such warnings would have

5  prevented the injury.  *See, e.g.*, *Vanderwerf v. SmithKlineBeecham Corp.*, 529 F. Supp. 2d 1294,

6  1313-14 (D. Kan. 2008); *cf. Jones*, 163 Cal. App. 3d at 402 (under California law, if "speculation

7  or conjecture" is required to prove "proximate cause then the granting of nonsuit is proper").  In

8  *Vanderwerf*, the court granted summary judgment on plaintiffs' claim that GSK's drug Paxil®

9  caused her husband to commit suicide.  529 F. Supp. 2d at 1297, 1314.  In response to the

10  argument that plaintiffs' failed to meet their proximate cause burdens in *Motus* and *Nix*, the

11  plaintiffs argued that although the physician may have still prescribed Paxil® to her husband

12  despite different warnings, the physician would have monitored her husband more closely and

13  warned him and/or his family of the risk of suicide.  *Id.* at 1313.  The court rejected these

14  arguments because they could not prove that the suicide would have been avoided without relying

15  on speculation: "plaintiffs have cited no evidence that Dr. Crane would have . . . succeeded in

16  preventing [Mr. Vanderwerf's] suicide, if he had received different warnings," *id.* at 1313; "[a]

17  jury might infer, as a matter of common sense, that Mr. Vanderwerf would have paid some

18  attention to additional warning information[;] [i]t would be entirely speculative, however, to

19  conclude that he would use this information to prevent his own suicide," *id.* at 1314 n.23;

20  "plaintiffs have presented no evidence that based on [different warnings], Mrs. Vanderwerf could

21  have prevented her husband's suicide," *id.* at 1314; "[s]peculation about how this tragedy might

22  have been avoided is absolutely understandable and perhaps inevitable, but plaintiffs cannot

23  escape summary judgment based on speculation," *id.*; *cf. Morales v. Am. Honda Motor Co., Inc.*,

24  151 F.3d 500, 507-08 (6th Cir. 1998) (plaintiffs' theory that child would not have suffered

25  _____

26  *Pharm.*, 526 F.3d 203, 214 (5th Cir. 2008) (affirming summary judgment on failure-to-warn claims because physician testified that a different warning "would not have changed [his] decision to prescribe Effexor") (alteration in original); *Odom v. G.D. Searle & Co.*, 979 F.2d

27  1001, 1003 (4th Cir. 1992) ("plaintiff [must] demonstrate that the additional non-disclosed risk was sufficiently high that it would have changed the treating physician's decision to prescribe the

28  product").

1    injuries from riding motorcycle while unsupervised if motorcycle had been designed with a key-

2    lock ignition rested on impermissible assumptions and speculation).

3         Without credible evidence that Tasigna® would not have been prescribed, or that

4    something else would have changed that would have prevented Mr. Lauris' death, plaintiffs

5    cannot prove that any alleged failure to warn by NPC caused Mr. Lauris' injuries.  Based on this

6    complete failure of proof, the Court should grant summary judgment in favor of NPC on

7    plaintiffs' all of plaintiffs' claims, as they are based on allegations of failure to warn.

8    **III.    PLAINTIFFS HAVE NO ADMISSIBLE EVIDENCE OF CAUSATION.**

9         Under California law, medical causation (*i.e.*, whether Tasigna® caused Mr. Lauris' death)

10   is an essential element of all of plaintiffs' claims.  *See, e.g.*, *Jones*, 163 Cal. App. at 402-03; *In re*

11   *Silicone Gel Breast Implants Prods. Liab. Litig.*, 318 F. Supp. 2d 879, 922 (C.D. Cal. 2004);

12   *Casey v. Ohio Med. Prods.*, 877 F. Supp. 1380, 1382 (N.D. Cal. 1995).  In a pharmaceutical

13   products liability case like this one, medical causation presents issues beyond the common

14   knowledge of lay jurors, which plaintiffs must prove through admissible expert testimony.  *See id.*

15   As shown in NPC's *Daubert* motions, plaintiffs have proffered no expert with admissible

16   causation opinions on either general causation or specific causation.  *See* NPC's concurrently

17   filed *Daubert* motions.  Therefore, NPC is entitled to judgment as a matter of law on all of

18   plaintiffs' claims.  Even if the Court denies some or all of NPC's *Daubert* motions regarding

19   general causation opinions, NPC would nevertheless be entitled to judgment as a matter of law in

20   this lawsuit if the Court excludes the case-specific causation opinions of plaintiffs' designated

21   expert witnesses Dr. Hoffmann and Dr. Wagmeister.  *See, e.g.*, *In re Silicone Gel Breast Implants*

22   *Prods. Liab. Litig.*, 318 F. Supp. 2d at 922 (granting summary judgment on case-specific

23   causation after holding that the testimony of plaintiffs' experts on case-specific causation failed to

24   meet the standards for admissibility under *Daubert*).

25   /////

26   /////

27   /////

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CONCLUSION**

For the foregoing reasons, the Court should grant this motion and enter summary judgment for NPC on all claims.

Dated: September 1, 2017

Respectfully submitted,

/s/ Sandra A. Edwards
Sandra A. Edwards (State Bar No. 154578)
(sedwards@fbm.com)
 FARELLA BRAUN + MARTEL LLP
 235 Montgomery Street, 17th Floor
 San Francisco, CA  94104
 Telephone:  (415) 954-4400
 Facsimile:  (415) 954-4480

/s/ Robert E. Johnston
Robert E. Johnston (admitted *pro hac vice*)
(rjohnston@hollingsworthllp.com)
Andrew L. Reissaus (admitted *pro hac vice*)
(areissaus@hollingsworthllp.com)
 HOLLINGSWORTH LLP
 1350 I Street, NW
 Washington, D.C. 20005
 Telephone: (202) 898-5800
 Facsimile: (202) 682-1639
*Attorneys for Defendant Novartis*
*Pharmaceuticals Corporation*

- 25 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 1, 2017, a true and copy of the foregoing was served

upon the following by operation of the Court's Electronic Case Filing System


Richard M. Elias
Greg Gutzler
Tamara M. Spicer
ELIAS GUTZLER SPICER LLC
1924 Chouteau Ave., Suite W
St. Louis, MO 63103

*Counsel for Plaintiffs*


Julie Y. Park
juliepark@mofo.com
Grant Esposito
gesposito@mofo.com
MORRISON & FOERSTER LLP
12531 High Bluff Drive
San Diego, CA 92130

*Counsel for Defendant Novartis AG*


/s/Sandra A. Edwards
Sandra A. Edwards (State Bar No. 154578)
(sedwards@fbm.com)
FARELLA BRAUN & MARTEL LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
Telephone:  (415) 954-4400
Facsimile:  (415) 954-4480

*Attorneys for Defendant*
*Novartis Pharmaceuticals Corporation*